**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Case No. 2:14-CR-127 |
| v. | : | Judge Algenon L. Marbley |
| ROBERT B. LEDBETTER, *et al.* | : | |
| Defendants. | : | |

**OPINION & ORDER**

Earlier this year, Defendant DeShawn Smith followed several of his co-defendants by moving to appear in court without physical restraints during his upcoming trial. (Doc. 892). Due in part to the large number of defendants standing trial together in the first trial of this sprawling racketeering case ("Trial I"), the Court permitted the use of both leg-irons *and* stun belts. (Doc. 980). Nevertheless, because Smith will stand trial alone, and because the security risks during his trial are reduced, the Court **GRANTS IN PART and DENIES IN PART** his motion to appear without restraints and will allow the use of a stun belt only during his trial.

**I. BACKGROUND**

Smith is one of twenty defendants originally indicted for his alleged involvement in the Short North Posse, an alleged criminal organization that operated the Short North area of Columbus, Ohio, from 2005 until 2014. Smith faces five charges, including one count of RICO conspiracy, one count of murder in aid of racketeering, one count of murder through use of a firearm during and in relation to a drug trafficking crime, one count of being a felon in possession of a firearm, and one count of possession with intent to distribute heroin. (Doc. 300). Smith is scheduled to stand trial by himself beginning September 26, 2016.

On January 27, 2016, this Court issued an Order memorializing a discussion from the January 25, 2016 meeting of the Ad Hoc Committee—a joint defense-prosecution steering committee that has provided guidance throughout this case. (Doc. 841). Among other issues, that Order addressed security measures that the Court was considering for Trial I, including the following passage regarding courtroom security:

> The Marshals Service indicated that all defendants will remain bound by leg-irons for the duration of the trials, although the defendants' hands will remain free once seated. Due to heightened security concerns, the Marshals Service will retain discretion to employ other security measures, including stun belts, for the duration of these trials. Representatives from the General Services Administration and the Court's procurement office pledged to provide suitable skirting for all defense tables to shield the defendants' leg-irons from the jury's view.

(*Id.* at PageID 4064).

On February 16, 2016, Smith (like several of his co-defendants) filed a motion requesting that he be permitted to appear in court without any physical restraints whatsoever or, alternatively, that he wear a stun belt but no leg-irons. (Doc. 892). At a Plenary Status Conference held on February 17, 2016, the Court made clear that it had not settled on any particular security measures for any of the trials just yet. Instead, the Court scheduled a series of hearings involving the various defendants, at which the Court anticipated "hear[ing] testimony and oral argument regarding the need for physical restraints and other courtroom security measures, including, but not limited to, the presence of law-enforcement personnel or other courthouse security officials." (Doc. 909; *see also* Doc. 1249 [Scheduling Order]).

On September 7, 2016, the Court conducted that evidentiary hearing for Smith's trial. The Court heard testimony from Supervisory Deputy U.S. Marshal Andrew Shadwick, who has served in his present capacity for six years, with roughly eleven years' experience as a Deputy Marshal beforehand. The Court also entertained oral argument.

Mr. Shadwick testified that, based on his training and experience, he recommended the highest measure of courtroom security his agency can provide. In short, he recommended that Smith be restrained by leg-irons and a stun belt during trial; that additional security officers be stationed both inside and out of the courtroom; and that a secondary security checkpoint be established just outside the courtroom. He based his recommendations on a variety of factors, including the following: (1) the nature of the allegations in this case—which involve racketeering conspiracy and murder; (2) Smith's criminal history; (3) the lengthy prison sentence that Smith faces if convicted; (4) Smith's purported gang affiliation; (5) Smith's evasion from law enforcement officials during his most recent arrest, which included fleeing on foot and jumping off a bridge overpass; and (6) several outbursts from gallery members during the trial of five of Smith's co-defendants earlier this year. Mr. Shadwick also testified that, in his estimate, a "belt and suspenders" approach—*i.e.*, employing both leg-irons and stun belts—was warranted to guarantee courtroom security, but that his agency would employ mitigating measures to reduce any prejudice against the defendants, including table skirting, noise mufflers, and strict protocol for jury entrance and exit.

On cross-examination, Mr. Shadwick acknowledged that, apart from fleeing during his arrest, Smith has not posed any problems for law-enforcement officials at his various facilities of pre-trial detention. He has not, for example, attempted to flee or inflict violence on any of his jailers. Mr. Shadwick also testified that the use of a stun belt alone could incapacitate an unruly defendant and that, in his experience, the stun belts the Marshals Service use have never malfunctioned. Indeed, Mr. Shadwick was unaware of a defendant ever acting out or attempting to flee while wearing a stun belt. Finally, Mr. Shadwick acknowledged that he was unaware of any specific plans from Smith or his associates to cause a disturbance at trial.

## II.  LEGAL STANDARDS

The use of physical restraints at trial implicates a defendant's right to due process of law. *Deck v. Missouri*, 544 U.S. 622, 629 (2005).  Therefore, before a trial court may allow physical restraints that are "visible to the jury," the court must make a determination, "in the exercise of its discretion, that they are justified by a state interest specific to a particular trial."  *Id.*  This determination may "take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial."  *Id.*  Nevertheless, the inquiry "must be case specific," in that "it should reflect particular concerns, [such as] special security needs or escape risks, related to the defendant on trial."  *Id.* at 633.  This rule applies to traditional forms of restraints, such as shackles and leg-irons, as well as to more modern forms of restraints, such as stun belts.  *See Lakin v. Stine*, 431 F.3d 959, 963-64 (6th Cir. 2005) (discussing use of leg-irons); *United States v. Miller*, 531 F.3d 340, 344-45 (6th Cir. 2008) (discussing use of stun belts).

Prior to making this individualized determination, the Sixth Circuit prefers that trial courts convene a formal hearing so that the evidence supporting their decision can be made part of the record.  *United States v. Perry*, 401 F. App'x 56, 64 (6th Cir. 2010) ("[W]e repeat here that a district court is to conduct a hearing and create a record of its findings as to why physical restraints during trial are necessary. . . . [Even] [i]f there is no objection by the defense, the government . . . should remind the judge to conduct a hearing on the reasons for restraining the defendants."); *see also Miller*, 531 F.3d at 345 (agreeing that trial court erred in permitting physical restraints without first conducting an evidentiary hearing or receiving any evidence).  *But see Deck*, 544 U.S. at 635 (implying that there may be "an exceptional case where the record itself makes clear that there are indisputably good reasons for shackling").

In determining whether to approve the use of physical restraints, district courts should consider several factors, including the following: "(1) the defendant's record, his temperament, and the desperateness of his situation; (2) the state of both the courtroom and the courthouse; (3) the defendant's physical condition; and (4) whether there is a less prejudicial but adequate means of providing security." *Lakin*, 431 F.3d at 964; *see also United States v. Waagner*, 104 F. App'x 521, 526 (6th Cir. 2004) (same); *accord Deck*, 544 U.S. at 628 (explaining that the right to be free from physical restraints is not absolute and can be overcome by such interests as "physical security, escape prevention, or courtroom decorum"). District courts may confer with the United States Marshals Service or corrections officers in deciding whether physical restraints are warranted in a particular case because those officers' opinions may be "highly relevant." *Lakin*, 431 F.3d at 964. But district courts abuse their discretion by simply deferring to the officers' recommendations without first engaging in the required individualized inquiry. *Id.*; *see also Miller*, 531 F.3d at 346 ("We have held previously that a district court's blind adherence to a corrections officer's recommendation, without making any individualized determinations or specific findings, amounts to an abuse of discretion.").

### III.  ANALYSIS

Although the Court permitted use of both leg-irons *and* stun belts during Trial I, careful consideration of the four factors discussed above shows that less drastic measures—*i.e.*, use of a stun belt only—can guarantee safety and decorum during Smith's trial. Given that Smith will stand trial alone, in a regularly configured courtroom, with sufficient security personnel present, and given the Sixth Circuit's recent reminder that shackling should be used only "as a last resort," *Adams v. Bradshaw*, 826 F.3d 306, 314 (6th Cir. 2016) (quotation omitted), the use of only a stun belt seems most appropriate.

### A. The Factors the Court Must Consider Counsel in Favor of Using *Some* Physical Restraints.

The Sixth Circuit has identified four factors to consider when making physical-restraint decisions. Together, those factors show the need for *some* physical restraints during Smith's trial, but not as aggressive an approach as the Court employed during Trial I, when more defendants stood trial together and when the security risks were greater.

*1. The Defendant's Record, His Temperament, and the Desperateness of His Situation*

Smith is currently detained pending trial. He has at least one prior felony conviction for an unspecified firearm offense. In this case, the Government charged Smith with one count of racketeering conspiracy (Count One); two substantive murder counts, including one count of murder in aid of racketeering and one count of murder through the use of a firearm during an in relation to a drug-trafficking crime—both for the 2008 death of Shane Allen McCuen (Counts Thirteen and Fourteen); one count of being a felon in possession of a firearm (Count Thirty-Six); and one count of possession with intent to distribute heroin (Count Thirty-Seven). Smith allegedly participated in seven overt acts in furtherance of the alleged RICO conspiracy. Those crimes include murder, attempted murder, robbery, attempted robbery, and various drug and firearm offenses. Smith faces a potential sentence of life imprisonment under the relevant statutes. Put simply, his record, his temperament, and the desperateness of his situation all counsel in favor of allowing *some* physical restraints so as to prevent any future violence or possibility of escape. That said, unlike the situation the Court faced with respect to Trial I, the Court heard no evidence suggesting that Smith has been unruly while detained or that he poses a likelihood of courtroom violence or attempted escape. Indeed, in the two years that he has been detained, Smith has not tried to flee or inflict any violence on law-enforcement personnel, and he has been a "model citizen" during all pre-trial hearings.

*2. The State of Both the Courtroom and the Courthouse*

Although the Court faced a unique situation when addressing similar motions to appear without physical restraints for Trial I—*i.e.*, multiple co-conspirators sitting in close proximity in a crowded courtroom—those concerns are not present here.  The well of the courtroom will be configured in its usual layout, wherein Smith will be seated between his two attorneys, who likewise will be flanked by plain-clothed deputy marshals both within the well of the courtroom and in the gallery.  A gated rail will separate Smith from the gallery and from the courtroom's nearest entrance.  With the well of the courtroom freed up of additional tables and parties, the movement of security personnel stationed in the courtroom will not be hampered.  These factors militate against requiring the use of leg-irons as in Trial I.  Nevertheless, the Court anticipates that several co-conspirators will testify against Smith, which likely will exacerbate tensions within the courtroom and increase the risk of an outburst or altercation if he is not restrained or deterred in some manner.  Reasonable physical restraints (a non-visible stun belt) will quell many of these risks.  Looking to the state of the courthouse more generally, the Court notes that security personnel will be somewhat burdened by this trial's length (four weeks), media interest, and the large number of trial observers.  Allowing reasonable physical restraints, calibrated to the precise threat of violence or potential escape, will enable those security personnel to maintain safety and security not just in this trial, but also throughout the courthouse more generally.

*3. The Defendant's Physical Condition*

Smith is a young man (in his mid-thirties) in decent physical condition, and thus seems able to inflict violence on others or to initiate a possible escape.  Nevertheless, the Court heard evidence that Smith suffered an injury to his foot while trying to flee from arrest by jumping off a bridge, and that his mobility may be somewhat hampered by that injury.

*4. Whether There Is a Less Prejudicial but Adequate Means of Providing Security*

Finally, and most importantly, there is no less prejudicial but adequate means of providing security. The gravity of Smith's alleged crimes, in addition to his attempted flight during his arrest, shows that the use of some physical restraint is warranted. Potential alternatives—including stationing additional security personnel within the courtroom—lack practicality and safety standing alone. As noted, courthouse security already will be stretched thin given the scope and duration of this trial, not to mention other more-routine courthouse business. Furthermore, the use of a stun belt provides a degree of assured safety simply not available through other means. Given the choice between allowing use of a stun belt (which is not visible to jurors) or use of leg-irons, which might, in some circumstances, become visible to jurors—the Court opts for the least prejudicial alternative that nevertheless will guarantee the safety and decorum of this trial. In sum, Smith's "individual criminal histor[y] . . . the violent crimes for which [he was] in fact indicted . . . and the fact that [he] had a full opportunity to respond to the court's concerns and raise alternative proposals" all show that the use of a non-visible stun belt is warranted in his trial. *See United States v. Baker*, 432 F.3d 1189, 1245-46 (11th Cir. 2005), *abrogated on other grounds by Davis v. Washington*, 547 U.S. 813, 821 (2006).

**B. The Court Will Take Steps to Minimize any Prejudice from the Physical Restraints.**

Although the use of some physical restraints is warranted, the Court will make every effort to eliminate the jury's awareness of those restraints so as to minimize the risk of prejudice. *See United States v. Orris*, 86 F. App'x 82, 86 (6th Cir. 2004) (holding that while district court "should have more clearly stated on the record" why physical restraints were warranted, reversal was not appropriate because "there [was] no indication . . . that shackling prevented Orris from consulting with his attorney, was ever seen by the jury, or otherwise prejudiced [him]").

Smith will be required to wear only a stun belt, which will not be plainly visible to the jury.  *See Deck*, 544 U.S. at 624 (limiting its holding to use of "visible shackles"); *Miller*, 531 F.3d at 347 (finding no prejudice where physical restraints were not visible).  Indeed, the stun belt will be worn underneath the defendant's clothing to minimize any risk of prejudice. *See Stevens v. McBride*, 489 F.3d 883, 899 (7th Cir. 2007).  Moreover, Smith's hands will remain free so that he may "participate in his own defense" by taking notes or bringing matters to his attorneys' attention.  *See Waagner*, 104 F. App'x at 525; *see also Orris*, 86 F. App'x at 86. Together, these precautions will lessen, if not eliminate, any prejudice to Smith.

### C. The Court Will Employ Other Security Measures for Smith's Trial.

In addition to the physical restraints discussed above, the Court will employ other security measures during Smith's trial.  These measures include operating a secondary security checkpoint just outside of the courtroom's main entry; requiring gallery members to leave their cellphones at this secondary security checkpoint to gain entrance to the courtroom; requiring all gallery members to provide a photo ID at the secondary checkpoint; and permitting the Marshals Service to control seating arrangements for the victims, their family members, and the family members of the defendants.  (*See* Doc. 841 at PageID 4064).  The Court finds these additional security measures necessary due to outbursts, incidents of harassment, and improper in-court photography that have occurred during several pre-trial proceedings in this case.

Finally, the Court will authorize the use of additional courtroom security personnel during Smith's trial, including uniformed Courtroom Security Officers, uniformed personnel from the Marshals Service, and plain-clothed personnel from the Marshals Service.  The use of courtroom security personnel does not raise the same type of constitutional concerns as does the use of physical restraints.  *See Holbrook v. Flynn*, 475 U.S. 568-69 (1986).  Accordingly, the

same type of individualized justification is not required.  *Id.*  Indeed, the Sixth Circuit encourages the use of security personnel to protect courtroom security and decorum.  *See Lakin*, 431 F.3d at 964 ("Since guards can be strategically placed in the courtroom when more than normal security is needed and can be hidden in plainclothes, the jury never need be aware of the added protection so that no prejudice would adhere to the defendant." (quotation omitted); *accord Holbrook*, 475 U.S. at 569 ("[T]he presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. . . . Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards.").

### IV.  CONCLUSION

For these reasons, the Court **GRANTS IN PART and DENIES IN PART** Smith's motion to appear without physical restraints (Doc. 892).  Following individual fact-finding on the record during the September 7, 2016 hearing, the Court will permit the use of a stun belt only, coupled with the cautionary measures and additional security protocols described above.

**IT IS SO ORDERED.**

        **s/ Algenon L. Marbley**
        **ALGENON L. MARBLEY**
        **UNITED STATES DISTRICT JUDGE**

**DATED:  September 9, 2016**